UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL RIVERA,                           :      CIVIL NO: 1:21-CV-01118
                                          :
                    Plaintiff,            :      (Magistrate Judge Schwab)
                                          :
            v.                            :
                                          :
LIEUTENANT REDFERN, *et al.,*             :
                                          :
                    Defendants.           :
                                          :

## <u>MEMORANDUM OPINION</u>

## I. Introduction.

The plaintiff Michael Rivera contends that the defendants violated the

Eighth Amendment by subjecting him to secondhand oleoresin capsicum spray

("OC spray") knowing that he has asthma.  Currently before the court is the motion

for summary judgment filed by the defendants, who contend that they are entitled

to qualified immunity as to Rivera's claims for damages against them in their

individual capacities, that the Eleventh Amendment bars his claim for damages

against them in their official capacities, and that his claims for declaratory and

injunctive relief are moot.  For the reasons set forth below, we will grant the

defendants' motion for summary judgment.

## II.  Background and Procedural History.

Rivera, who is representing himself, began this action by filing a complaint in the Court of Common Pleas of Centre County, Pennsylvania.  The complaint concerns an incident involving the use of OC spray that occurred at the State Correctional Institution Benner Township (SCI Benner Township) in June 2020, and it names four officers or employees of SCI Benner Township: (1) Lieutenant Redfern; (2) Corrections Officer Schreck;[1] (3) Corrections Officer Monsell; and (4) Nurse Phil Rogers.

In June 2021, the defendants removed the case to this court and filed an answer to the complaint.  The parties then consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned. We set case management deadlines, and we tried to settle the case.  After the case did not settle, the defendants filed a motion for summary judgment.  That motion is ripe, and for the reasons set forth below, we will grant that motion.

## III.  Summary Judgment Standards.

The defendants move for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary

---

[1] Rivera refers to this defendant as both Shreck and as Schreck.  We will refer to this defendant as Schreck because that is how defense counsel refers to him.

judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011) (quoting Fed. R. Civ. P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing

that the materials cited do not establish the absence . . . of a genuine dispute." Fed.
R. Civ. P. 56(c).  If the nonmoving party "fails to make a showing sufficient to
establish the existence of an element essential to that party's case, and on which
that party will bear the burden at trial," summary judgment is appropriate. *Celotex*,
477 U.S. at 322.

Summary judgment is also appropriate if the nonmoving party provides
merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 249 (1986).  There must be more than a scintilla of evidence
supporting the nonmoving party and more than some metaphysical doubt as to the
material facts. *Id.* at 252.  "Where the record taken as a whole could not lead a
rational trier of fact to find for the non-moving party, there is no 'genuine issue for
trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586
(1986).

The substantive law identifies which facts are material, and "[o]nly disputes
over facts that might affect the outcome of the suit under the governing law will
properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.  A
dispute about a material fact is genuine only if there is a sufficient evidentiary
basis that would allow a reasonable fact finder to return a verdict for the non-
moving party. *Id.* at 248–49.

When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).  At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249.  The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.  "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Celotex,* 477 U.S. at 323).  "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made

in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

## IV.  Material Facts.

Here, in accordance with Local Rule 56.1, the defendants filed a statement of material facts, and Rivera filed a response.  Where the facts set forth by the defendants are undisputed, we cite to the defendants' statement of material facts (*doc. 24*) and Rivera's response thereto (*doc. 29*).

In addition to responding to the defendants' statement of material facts, Rivera submitted a document entitled "Plaintiff's Statement of Disputed Facts." *See doc. 30*.  In this document, without pointing to record evidence, Rivera merely sets forth seven questions regarding the ultimate issues in this case. *Id*.  Under our local rules, this is not a proper way to oppose the defendants' statement of material facts, and we will not consider this document further.

Rivera also submitted a declaration made under penalty of perjury in opposition to the motion for summary judgment. *See doc. 31* at 1–7.  In accordance with our duty to "construe all facts and inferences in favor of the nonmoving party[,]" *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021) (quoting *Santini v. Fuentes*, 795 F.3d 410, 419 (3d Cir. 2015)), for purposes of the pending summary judgment motion, we accept as true the facts set forth in Rivera's

declaration.  But Rivera's declaration also contains legal conclusions, which we do not accept as true.

Rivera also submitted a declaration made under penalty of perjury from another inmate—Gene Brown. *See doc. 31* at 8–11.  Brown substantially corroborates Rivera's version of the events, and in setting forth the material facts, we rely on Brown's declaration as well as Rivera's.

The following facts are the material facts for purposes of the pending summary judgment motion.  The incident at issue in this case occurred on June 20, 2020, in the Restricted Housing Unit ("RHU") of SCI Benner Township. *Doc. 24* ¶ 1; *Doc. 29* ¶ 1.  At approximately 5:30 p.m.,[2] defendants Schreck and Monsell escorted Rivera to the telephone cage. *Doc. 24* ¶ 2; *Doc. 29* ¶ 2.  The telephone cage was an open-air cage. *Doc. 31* ¶ 4.  It was located on the lower level of the RHU pod, and it was approximately 25–30 feet away from Rivera's cell, which was also located on the lower level. *Doc. 24* ¶ 3; *Doc. 29* ¶ 3.  On a normal evening, Rivera would have been permitted to remain in the telephone cage for 30 minutes. *Doc. 24* ¶ 6; *Doc. 29* ¶ 6.

Approximately halfway through his time in the telephone cage, Rivera heard defendant Redfern request that defendant Schreck stand by cell JA2023 for

---

[2] Sometimes, the defendants refer to both military time and civilian time, and sometimes, they refer to only military time.  For ease of reference, we have converted all times to civilian times.

7

observation, and he noticed that Monsell had left the pod. *Doc. 24* ¶ 7; *Doc. 29* ¶ 7. Recognizing that the officers were preparing to use force against the inmate in cell JA2023, Rivera immediately informed defendants Redfern and Schreck that he is asthmatic and that exposure to secondhand OC spray while in the open-air cage would trigger him to have an asthma attack. *Doc. 31* at 2, ¶ 6.  He requested to be returned to his cell, explaining that he would not be adversely affected by the use of OC spray if he were inside his cell. *Id.*  Defendants Redfern and Schreck ignored his request. *Id.*

Later, when defendant Monsell was performing his regularly scheduled rounds and wellness checks in the RHU, Rivera spoke to him also. *Id.* at 3, ¶ 9. Rivera explained to Monsell that being unnecessarily exposed to secondhand OC spray while in the open-air cage would cause him to have an asthma attack, and he asked Monsell to return him to his cell. *Id.*  Monsell also ignored Rivera's request. *Id.*

Between approximately 5:45 p.m. and 7:00 p.m., defendants Redfern and Monsell entered the pod more then two times each, and each time that they did so, Rivera reiterated his request to be returned to his cell. *Id.* at 4, ¶ 11.  The defendants ignored these requests. *Id.*  Defendant Schreck could see and hear Rivera pleading with defendants Redfern and Monsell to return him to his cell. *Id.* at 4, ¶ 12.  And while in the telephone cage, Rivera also spoke to defendant

Schreck numerous times about how unreasonable they were being by not returning him to his cell. *Id*.

Inmate Gene Brown, who was in cell JA1024, states that from his cell, he heard Rivera asking defendants Schreck, Monsell, and Redfern to have him escorted back to his cell before the use of OC spray. *Doc. 31* at 8–9, ¶¶ 2, 5.  He also heard Rivera inform Redfern and Schreck that he was asthmatic and that he would be strongly affected by the OC spray. *Id*. at 9, ¶ 5.  The officers told Rivera that there was not enough RHU staff available to escort him back to his cell due to the ongoing preparation for the use of force. *Id*.

At about 6:45 p.m., defendant Rogers entered the pod for the first time. *Doc. 31* at 4, ¶ 13.  As Rogers passed the telephone cage, Rivera explained to him that he is asthmatic and that being unnecessarily exposed to OC spray while in the open-air cage would cause him to have an asthma attack. *Id*.  Rogers responded: "I know." *Id*.  And when Rivera asked Rogers to return him to his cell, Rogers responded: "I'll let Redfern know." *Id*.

Brown also overheard Rivera inform defendant Rogers that he is asthmatic and that he would be strongly affected by the OC spray. *Doc. 31* at 9, ¶ 7.  And in response to Rivera's request to be returned to his cell, he heard Rogers respond: "What can I do, Rivera?  That's not up to me, that's on Redfern." *Id*.

9

Closed circuit video footage captured at least some of the relevant events at issue here; the footage submitted by the defendants shows the outside of cell JA2023 from an angle pointing toward the RHU exit from 6:21 p.m. through 7:15 p.m. *Doc. 24* ¶ 12; *Doc. 29* ¶ 12.[3]  During this time period, Officer Schreck is seen standing outside of cell JA2023. *Doc. 24* ¶ 13; *Doc. 29* ¶ 13.  The defendants contend that from the video, it does not appear that Officer Schreck communicates with Rivera until he leaves the unit around 6:40 p.m. *Doc. 24* ¶ 14.  But as Rivera points out, the video lacks audio. *Doc. 29* ¶ 14.  And from our review of the video, the video shows defendant Schreck at times standing on the second tier looking in the direction of the telephone cage.  We cannot tell from the video whether he is speaking to Rivera.

The video also does not show any of the other defendants—Redfern, Monsell, or Rogers—on the unit from 6:21 p.m. through 6:40 p.m. or from 6:42 p.m. through 7:12 p.m. *Doc. 24* ¶ 15.  But a little after 6:40 p.m., Redfern is seen

---

[3] Rivera objects that the defendants "purposely omitted over an hour of video footage, in an attempt to obfuscate [his] claims that he spoke to each Defendant personally, and informed each Defendant that unnecessarily exposing [him] to secondhand OC spray in the open-air telephone cage would adversely affect his asthma." *Doc. 29* ¶ 12.  As set forth above, we accept as true, Rivera's statements in his declaration regarding what he told the defendants.

entering the unit, walking right up to JA2023, and he is seen leaving two minutes

later. *Id*.[4]

Handheld video footage begins with defendant Redfern identifying that it is

7:04 p.m. *Doc. 24* ¶ 16; *Doc. 29* ¶ 16.[5]  Redfern explains that he has had an on-

going issue with an inmate[6] covering and uncovering his door, which is slowing

down the operations of the RHU and is a safety issue because officers cannot

always get a visual on the inmate. *Doc. 24* ¶ 17; *Doc. 29* ¶ 17.  The inmate was

given an order to leave his cell, but he refused, causing defendant Redfern to form

a compliance team. *Doc. 24* ¶ 18; *Doc. 29* ¶ 18.  Defendant Monsell was operating

the handheld camera, and defendant Rogers was also present. *Doc. 24* ¶ 19; *Doc.

29* ¶ 19.

_____

[4] Rivera purports to dispute these facts by pointing out that the defendants
have not submitted the video of the entire incident.  Be that as it may, Rivera has
not pointed to evidence that at those specific times, the defendants were on the
block.  Nevertheless, as set forth above, we accept his statements of fact in his
declaration that he spoke to the defendants.  This is so, even though there may be
some discrepancies about the exact times that events happened.  In this regard, we
note that the defendants' timeline of the events is also not without discrepancies.
For example, as set forth later, they say that the compliance team entered the RHU
at around 7:12 p.m., but they also say that the OC spray was applied at 7:09 p.m.
*See doc. 24* ¶¶ 20, 24.  Clearly, the OC spray was not applied before the
compliance team entered the RHU.

[5] Unlike the closed circuit video footage, the footage from the handheld
camera contains audio.

[6] To be clear, the inmate to whom Redfern is referring is not Rivera; it is the
inmate in cell JA2023.

According to Rivera, at approximately 7:00 p.m., the defendants entered the pod wearing protective gas masks. *Doc. 31* ¶ 14.  Rivera again asked defendant Rogers to have him returned to his cell before OC spray was used, and Rogers responded: "What do you want me to do, Rivera?  That's up to Redfern." *Id.*

According to the defendants, the compliance team enters the RHU at or around 7:12 p.m. *Doc. 24* ¶ 20; *Doc. 29* ¶ 20.  On the video, Rivera can be seen standing in the telephone cage as officers pass by him to climb the steps. *Doc. 24* ¶ 21; *Doc. 29* ¶ 21.[7]  The compliance team climbs the stairs, turns left, and walks to the third cell on the right. *Doc. 24* ¶ 23; *Doc. 29* ¶ 23.  OC spray was applied into the cell at 7:09 p.m. *Doc. 24* ¶ 24; *Doc. 29* ¶ 24.[8]  Throughout this time, defendants Redfern, Monsell, and Rogers, as well as the rest of the compliance team, were focused on dealing with the inmate who needed to be removed from his cell. *Doc. 24* ¶ 25; *Doc. 29* ¶ 25.  The compliance team escorted the inmate off the pod, followed by defendants Redfern, Rogers, and Monsell. *Doc. 24* ¶ 26; *Doc. 29* ¶ 26.

When the inmate is being escorted off of the pod, Rivera is again seen on the video in the telephone cage. *Doc. 24* ¶ 27; *Doc. 29* ¶ 27.  At this point, Rivera shows no signs of distress or a need for medical treatment. *Doc. 24* ¶ 28; *Doc. 29*

---

[7] According to the defendants, Rivera makes no comments towards the officers at this time. *Doc. 24* ¶ 22.  In support of this assertion, the defendants point to the video. *Id.*  But we cannot tell from the video what, if anything, Rivera said to the defendants as they were passing him or as they were climbing the stairs.

[8] Again, we note the discrepancy in the defendants' timeline. *See supra* n.4.

12

¶ 28.[9]  Rivera testified during his deposition that his asthma kicked in within three minutes of the compliance team coming down the stairs and exiting the pod. *Doc. 24* ¶ 29; *Doc. 29* ¶ 29.  According to Rivera, he experienced severe difficulty breathing, dizziness, coughing, sneezing, strong eye irritation, and vomiting. *Doc. 31* at 5–6, ¶¶ 19, 21.  After about five minutes, an officer returned to the pod and obtained Rivera's asthma pump for him. *Doc. 24* ¶ 30; *Doc. 29* ¶ 30.  Rivera was then escorted back to his cell for five to ten minutes before being escorted to receive additional medical treatment. *Doc. 24* ¶ 31; *Doc. 29* ¶ 31.[10]

When Rivera was still in the telephone cage, Inmate Brown witnessed him having an asthma attack, and after Rivera was returned to his cell, Inmate Brown could hear Rivera coughing and vomiting. *Doc. 31* at 9–10, ¶¶ 8, 10.

The OC spray was deployed in cell JA2023, which was up the stairs, and several cell doors passed the landing; "probably double" the distance away from

---

[9] Rivera purports to deny this statement, objecting again that the defendants have not submitted a video of the entire incident. *Doc. 29* ¶ 28.  But Rivera has not pointed to record evidence to create a genuine factual dispute about whether he was showing signs of distress or need for medical treatment at the point when the inmate was escorted off the pod.

[10] Rivera claims that the defendants violated his Eighth Amendment rights by allowing him to be exposed to secondhand OC spray despite knowing that he has asthma, but he does not argue that the defendants denied him medical treatment once his asthma flared. *Doc. 24* ¶¶ 32, 33; *Doc. 29* ¶¶ 32, 33.

the telephone cage as compared to Rivera's cell. *Doc. 24* ¶ 4; *Doc. 29* ¶ 4.[11]

Nevertheless, according to Rivera, if he had been in his cell, instead of the open-air

telephone cage, when the OC spray was used, he would not have suffered an

asthma attack. *Doc. 31* at 7, ¶ 26. If Rivera had been in his cell when the OC spray

was deployed, he would have placed a wet rag over his face, but he still may have

started sneezing and his eyes may still have watered. *Doc. 24* ¶ 5; *Doc. 29* ¶ 5.

Rivera testified that during a use-of-force incident, all normal RHU

procedures are on pause. *Doc. 24* ¶ 8; *Doc. 29* ¶ 8.[12] These events usually take

_____

[11] Given that cell JA2023 was twice the distance from the telephone cage as from Rivera's cell, *doc. 24* ¶ 4; *doc. 29* ¶ 4, and as set forth earlier, the telephone cage was approximately 25–30 feet away from Rivera's cell, *doc. 24* ¶ 3; *doc. 29* ¶ 3, it follows that cell JA2023 was approximately 50-60 feet away from the telephone cage.

[12] Although Rivera purported to deny this statement, we conclude that there is no genuine dispute of fact. The defendants cite to Rivera's deposition testimony to support this assertion. Rivera, however, "disagrees with the characterization of his deposition testimony as if it is prison policy and procedure." *Doc. 29* ¶ 8. And he argues that just because there is a pause of normal activities, does not mean that the defendants could not have returned him to his cell before the use-of-force incident. *Id.* But he has not pointed to record evidence creating a genuine dispute of fact regarding whether during a use-of-force incident all normal RHU procedures are on pause. Nevertheless, we understand Rivera's argument, and our conclusion that there is no genuine dispute of fact here does not foreclose that argument. And, as set forth below, we accept Rivera's assertion in his declaration that there was no prison policy or procedure that precluded the defendants from returning him to his cell prior to the use of the OC spray.

14

about an hour to ninety minutes to execute. *Doc. 24* ¶ 9; *Doc. 29* ¶ 9.[13]  All inmates, including Rivera, must be escorted everywhere in the RHU regardless of their status. *Doc. 24* ¶ 10; *Doc. 29* ¶ 10.[14]  Escorts to and from a cell required at least two officers per inmate. *Doc. 24* ¶ 11; *Doc. 29* ¶ 11.[15]  Still, according to Rivera, there is no prison policy or procedure that precluded the defendants from returned him to his cell prior to their use of OC spray. *Doc. 31* at 5, ¶ 18.

## V.  Discussion.

The defendants contend that they are entitled to qualified immunity from Rivera's claim for damages against them in their individual capacities.  They also contend that the claims for damages against them in their official capacities are barred by the Eleventh Amendment.  And they contend that Rivera's requests for declaratory and injunctive relief are moot.[16]  We address each contention in turn.

---

[13] Rivera objects to his testimony being characterized as prison policy, but he has not pointed to evidence creating a genuine dispute of fact. *See supra* n.12.

[14] Rivera objects to his testimony being characterized as prison policy, but he has not pointed to evidence creating a genuine dispute of fact. *See supra* n.12.

[15] Rivera objects to his testimony being characterized as prison policy, but he has not pointed to evidence creating a genuine dispute of fact. *See supra* n.12.

[16] The defendants fold their argument regarding mootness into their Eleventh Amendment argument.  For clarity, we treat the mootness argument as a separate argument.

**A.  Qualified immunity bars Rivera's claims for damages against the defendants in their individual capacities.**

The defendants are entitled to qualified immunity from Rivera's claims for damages against them in their individual capacities.

Despite their participation in constitutionally impermissible conduct, government officials "may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity ensures that before officers are subjected to suit, they have notice that their conduct is unlawful. *Id.*  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009).  "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818–19.

The qualified immunity analysis has two prongs. *Pearson,* 555 U.S. at 232. One prong of the analysis is whether the facts that the plaintiff has alleged or shown make out a violation of a constitutional right. *Id.*  The other prong of the analysis is whether the right was clearly established. *Saucier v. Katz,* 533 U.S. 194,

16

201 (2001).  The court is permitted to exercise its discretion in deciding which of the two prongs of the qualified-immunity analysis should be addressed first considering the circumstances of the particular case. *Pearson,* 555 U.S. at 236. Thus, the court may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. *Id.*  In fact, the Supreme Court has stressed "that lower courts 'should think hard, and then think hard again,' before addressing both qualified immunity and the merits of an underlying constitutional claim." *D.C. v. Wesby*, 138 S. Ct. 577, 589 n.7 (2018) (quoting *Camreta v. Greene,* 563 U.S. 692, 707 (2011)).  Here, given that we conclude that the law was not clearly established such as to put the defendants on notice that spraying a targeted burst of OC spray into another prisoner's cell 50-60 feet[17] away from an inmate with asthma violates the Eighth Amendment, we will decide the claim based on qualified immunity without deciding whether there was, in fact, a constitutional violation.

The Eighth Amendment prohibits inhumane conditions of confinement. *Clark v. Coupe*, 55 F.4th 167, 179 (3d Cir. 2022).  Eighth Amendment claims have both an objective element and a subjective element. *Ricks v. Shover*, 891 F.3d 468, 473 (3d Cir. 2018),  "To determine whether prison officials have violated the

---

[17] *See supra* n.11.

Eighth Amendment, we apply a two-prong test: (1) the deprivation must be

'objectively, sufficiently serious; a prison official's act or omission must result in

the denial of the minimal civilized measure of life's necessities'; and (2) the prison

official must have been 'deliberate[ly] indifferen[t] to inmate health or safety.'"

*Porter v. Pennsylvania Dept of Corr.*, 974 F.3d 431, 441 (3d Cir. 2020) (quoting

*Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

Here, both Rivera and the defendants frame Rivera's claims as Eighth

Amendment conditions-of-confinement claims. *See doc. 28* (Rivera's brief) at 2

(setting forth the deliberate indifference standard); *doc. 23* (defendants' brief) at 12

(same).  Because this is how the parties frame the claims, this is also how we will

frame the claims.[18]  Although the general parameters of an Eighth Amendment

---

[18] When OC spray is directed at a particular prisoner, however, the claim is
analyzed as an Eighth Amendment excessive force claim. *See Gibson v. Flemming*,
837 F. App'x 860, 862 (3d Cir. 2020) (analyzing claim that prisoner was sprayed
with OC spray as an Eighth Amendment excessive force claim).  When prison
officials are accused of using excessive force in violation of the Eighth
Amendment, the inquiry "is whether force was applied in a good-faith effort to
maintain or restore discipline, or maliciously and sadistically to cause harm."
*Hudson v. McMillian*, 503 U.S. 1, 7 (1992).  The standard for an Eighth
Amendment excessive force claim (whether force was applied maliciously and
sadistically to cause harm) is different from the standard for an Eighth Amendment
conditions-of-confinement claim (whether the defendants were deliberately
indifferent to the inmate's health or safety).  When the claim is an Eighth
Amendment claim about exposure to secondhand OC spray (or similar chemical
sprays), some courts, as in the cases cited later, apply the deliberate indifference
standard applicable to conditions-of-confinement claims.  But some apply the
Eighth Amendment excessive-force framework. *See, e.g.*, *Redmond v. Crowther*,
882 F.3d 927, 936 (10th Cir. 2018) (reasoning that "[w]hich framework applies

18

conditions-of-confinement claim are clearly established, for qualified immunity purposes, the law cannot be defined at such "a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); *see also City of Tahlequah, Oklahoma v. Bond*, 142 S. Ct. 9, 11 (2021) ("We have repeatedly told courts not to define clearly established law at too high a level of generality.").

"To determine whether a right was 'clearly established,' we conduct a two-part inquiry." *Peroza-Benitez*, 994 F.3d at 165. "First, we must 'define the right allegedly violated at the appropriate level of specificity.'" *Id*. (quoting *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012)). "This requires us to frame the right 'in light of the specific context of the case, not as a broad general proposition.'" *Id*. (quoting *Saucier*, 533 U.S. at 201). "Second, we must ask whether that right was 'clearly established' at the time of its alleged violation, *i.e.*, whether the right was 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id*. (quoting *Saucier*, 533 U.S. at 202). "This is an 'objective (albeit fact-specific) question,' where '[an officer]'s subjective beliefs . . . are irrelevant.'" *Id*. (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

---

turns not on whom the force was applied to but, rather, on why the officials deployed the force in the first place" and since the decision to use CS gas involved the use or force to restore order, the excessive-force framework applies even to claims by prisoners who were not the intended target of the CS gas). Here, as mentioned above, we apply the conditions-of-confinement framework. But our conclusion that the defendants are entitled to qualified immunity would not change even if we applied the excessive-force framework.

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *Wesby*, 138 S. Ct. at 589.  In other words, "[t]he rule must be 'settled law,' which means it is dictated by 'controlling authority' or 'a robust 'consensus of cases of persuasive authority.'" *Id*. at 589–90 (internal citations omitted).  "It is not enough that the rule is suggested by then-existing precedent." *Id*. at 590.  Rather, "[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id*.

Still, "the facts of the existing precedent need not perfectly match the circumstances of the dispute in which the question arises." *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 570 (3d Cir. 2017).  "A public official does not get the benefit of 'one liability-free violation' simply because the circumstance of his case is not identical to that of a prior case." *Peroza-Benitez*, 994 F.3d at 166 (quoting *Kopec v. Tate*, 361 F.3d 772, 778 (3d Cir. 2004)).  But if the law did not put the officer on notice that his conduct would be clearly unlawful, qualified immunity is appropriate. *Bayer v. Monroe County Children & Youth Services*, 577 F.3d 186, 193 (3d Cir. 2009).  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Reichle v. Howards,* 566 U.S. 658, 664 (2012) (quoting *al-Kidd,* 563 U.S. at 741).  "This exacting standard 'gives government officials breathing room to make reasonable

20

but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (quoting *al-Kidd*, 563 U.S. at 743).

In determining if a right was clearly established, "'[t]he ultimate question is whether the state of the law when the offense occurred' gave the prison officials 'fair warning' that their conduct violated [the plaintiff's] Eighth Amendment right." *Clark*, 55 F.4th at 181 (quoting *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 247 (3d Cir. 2016)). "To determine whether such 'fair warning' existed, we search first for 'factually analogous' cases in the Supreme Court, and then turn our inquiry to whether 'binding opinions from our own Court; were in existence." *Id*. (quoting *Peroza-Benitez*, 994 F.3d at 165). "If neither source provides relevant caselaw, we consider whether 'a robust consensus of cases of persuasive authority in the Court of Appeals could clearly establish a right for purposes of qualified immunity.' *Id*. (quoting *L. R.*, 836 F.3d at 248) "Finally, '[w]e may also take into account district court cases, from within the Third Circuit or elsewhere.'" *Id* (quoting *Peroza-Benitez*, 994 F.3d at 166).

The defendants contend that they "are entitled to qualified immunity because it is not clearly established that secondhand exposure to OC spray in response to another inmate's actions across the block, would violate an individual's rights." *Doc. 23* at 9. We agree.

Neither the defendants nor Rivera cite to any Supreme Court or published Third Circuit cases that are on point.  Nor have we found any.  Further, the parties do not point to (and we have not found) a "robust consensus of cases of persuasive authority in the Court of Appeals." *Clark* 55 F.4th at 181.  And although both Rivera and the defendants point to some lower court cases, those cases, which are not directly on point, would not alert a reasonable official that just because an inmate has asthma that means that he is at substantial risk of serious injury by a secondhand exposure to OC spray where that the OC spray was sprayed inside another prisoner's cell and the inmate with asthma was approximately 50-60 feet away.  In fact, the case law points in the opposite direction. *See, e.g.*, *Davis v. Thomas*, 558 F. App'x 150, 155 (3d Cir. 2014) (affirming grant of summary judgment to defendants because, among other reasons, the "defendants showed through competent medical evidence that [the plaintiff's] asthma condition was not so serious that he could never be near the use of pepper spray, or that he risked serious damage to his future health if exposed to second-hand pepper spray" and the plaintiff's "personal opinion to the contrary will not suffice to defeat the defendants' motion for summary judgment"); *Stroman v. Wetzel*, No. 1:16-CV-2543, 2020 WL 1531325, at *5 (M.D. Pa. Mar. 31, 2020) (granting summary judgment to defendants as to Eighth Amendment claim brought by inmate with asthma based on exposure to secondhand exposure to OC spray concluding that the

inmate failed to establish a constitutional violation because he had not shown that the defendants were actually aware that he had asthma and actually knew that the OC spray could reach his cell and potentially cause harm and also concluding that the defendants are entitled to qualified immunity because the "[d]efendants simply could not have recognized that their use of OC spray in response to another inmate's actions across the block would violate a 'clearly established statutory or constitutional right[] of which a reasonable person would have known'"); *Johnson v. Palockovich*, No. CIV.A.4:04-CV-1804, 2007 WL 431890, at *5 (M.D. Pa. Feb. 5, 2007) (granting motion to dismiss Eighth Amendment claim based on secondhand exposure to pepper spray and concluding "even assuming *arguendo*" that the defendants knew that the plaintiff had asthma, they did not act with deliberate indifference given that there were no facts alleged that indicate that the defendants were "subjectively aware that the direct and isolated use of pepper spray upon the unruly inmate would cause a substantial risk that the Plaintiff would suffer an asthma attack" where "the pepper spray was not wantonly dispersed throughout the cell block, but administered to a single, particular inmate, contained within his cell"); *but see Roberts v. Luther*, No. 1:21-CV-00958, 2021 WL 5233318, at *7 (M.D. Pa. Nov. 10, 2021) (concluding that inmates have a clearly established right under the Eighth Amendment "to be free from the unnecessary use of chemical agents without penological justification" and "to be free from the

use of 'massively excessive' amounts of OC spray designed to inflict unnecessary pain" and denying qualified immunity at the motion-to-dismiss stage of the proceedings based on the plaintiff's allegations that he suffered adverse effects after OC spray was used on five separate incidents—two of which "involved the use of 'massively excessive' amounts of OC spray on inmates in cells within close proximity to" the plaintiff's cell; one of which involved the use of "'massively excessive' amounts of OC spray in the area directly in front of" the plaintiff's cell; and two of which involved officers spraying "'massive amounts of OC spray directly into the RHU's central air system").[19]

Because the case law is not such that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply," *Wesby*, 138 S. Ct. at 590, the defendants are entitled to qualified immunity from Rivera's claim for damages against them in their individual capacities.

---

[19] *Roberts* is distinguishable from this case because unlike in *Roberts*, here Rivera does not argue that there was no penological justification for use of the OC spray to remove the other inmate from his cell. Moreover, here massively excessive amounts of OC spray were not used. Our review of the video shows that a targeted burst of OC was sprayed directly into the other prisoner's cell through the wicket on the cell door.

**B.  Rivera's claim for damages against the defendants in their official capacities are barred by the Eleventh Amendment.**

The defendants contend that the claims for damages against them in their official capacities should be dismissed because they are barred by the Eleventh Amendment.

"Our federalist system of government accords respect for the sovereignty of the States in a variety of ways, including the Eleventh Amendment to the United States Constitution, which immunizes States from suits brought in federal court by both their own citizens and citizens of other States." *Maliandi v. Montclair State Univ.*, 845 F.3d 77, 81 (3d Cir. 2016).  The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. Amend. XI.  Although its text appears to restrict only the Article III diversity jurisdiction of the federal courts, the Eleventh Amendment has been interpreted "'to stand not so much for what it says, but for the presupposition . . . which it confirms.'" *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996) (quoting *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779 (1991)).  That presupposition is that each state is a sovereign entity in our federal system and it is inherent in the nature of sovereignty that a sovereign is not amenable to suit unless it consents. *Id.*

"Immunity from suit in federal court under the Eleventh Amendment is designed to preserve the delicate and 'proper balance between the supremacy of federal law and the separate sovereignty of the States.'" *Karns v. Shanahan*, 879 F.3d 504, 512 (3d Cir. 2018) (quoting *Alden v. Maine*, 527 U.S. 706, 757 (1999)). It "serves two fundamental imperatives: safeguarding the dignity of the states and ensuring their financial solvency." *Id.*  It serves those interests by barring suits against the nonconsenting states. *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000) (stating that "the Constitution does not provide for federal jurisdiction over suits against nonconsenting States"); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment.").

There are two circumstances when the Eleventh Amendment does not bar a suit against a state or state agency.  First, a state may waive its Eleventh Amendment immunity by consenting to suit. *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 670 (1999).  Second, Congress may abrogate a state's Eleventh Amendment immunity when it unequivocally intends to do so and when it acts pursuant to a valid grant of constitutional authority. *Geness v. Admin. Off. of Pennsylvania Cts.*, 974 F.3d 263, 269–70 (3d Cir. 2020).  Neither of those circumstances are present here.  The

26

Commonwealth of Pennsylvania has not waived its Eleventh Amendment immunity. *See* 42 Pa. Stat. and Cons. Stat. Ann. § 8521(b) ("Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States."); *Downey v. Pennsylvania Dep't of Corr.*, 968 F.3d 299, 310 (3d Cir. 2020) ("Pennsylvania has not waived its sovereign immunity defense in federal court.").  And 42 U.S.C. § 1983, under which Rivera brings his claims, does not override a state's Eleventh Amendment immunity. *Quern v. Jordan*, 440 U.S. 332 (1979).

Further, claims for damages against a state official in his or her official capacity are barred by the Eleventh Amendment.  Official-capacity suits are "only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978).  In an official-capacity suit, the entity of which the officer is an agent is the real party in interest. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  As such, claims against state officials in their official capacities for damages are treated as suits against the state and are barred by the Eleventh Amendment. *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Hum. Servs.*, 730 F.3d 291, 318 (3d Cir. 2013).  Thus, Rivera's claims against the defendants in their official capacities for damages are barred by the Eleventh Amendment.

Claims against a state official in his or her official capacity for prospective declaratory or injunctive relief are not barred by the Eleventh Amendment. *See Ex parte Young*, 209 U.S. 123 (1908).  Thus, we turn to Rivera's claims for such relief.

### C.  Rivera's claims for declaratory and injunctive relief are moot.

In addition to damages, Rivera seeks declaratory and injunctive relief. *See doc. 1-2* (complaint) ¶¶ 41–42.  Because Rivera is no longer incarcerated in the RHU at SCI Benner Township, the defendants contend that his claims for declaratory and injunctive relief are moot.

Article III of the Constitution limits the judicial power of the United States to "cases" and "controversies." U.S. Constitution, art. III, § 2.  "This case-or-controversy limitation, in turn, is crucial in 'ensuring that the Federal Judiciary respects the proper—and properly limited—role of the courts in a democratic society.'" *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 539 (3d Cir. 2017) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)).  "And courts enforce it 'through the several justiciability doctrines that cluster about Article III,' including 'standing, ripeness, mootness, the political-question doctrine, and the prohibition on advisory opinions.'" *Id*. (quoting *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 137 (3d Cir. 2009)).

28

This case involves mootness, which is "a doctrine that 'ensures that the litigant's interest in the outcome continues to exist throughout the life of the lawsuit,'" and which "is 'concerned with the court's ability to grant effective relief.'" *Hamilton v. Bromley*, 862 F.3d 329, 335 (3d Cir. 2017) (quoting *Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 476 (3d Cir. 2016), and *Cty. of Morris v. Nationalist Movement*, 273 F.3d 527, 533 (3d Cir. 2001)).  "[F]ederal courts may adjudicate only actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990).  And "[i]t is a basic principle of Article III that a justiciable case or controversy must remain 'extant at all stages of review, not merely at the time the complaint is filed.'" *United States v. Juvenile Male*, 564 U.S. 932, 936 (2011) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997)).  "Federal courts may not 'decide questions that cannot affect the rights of litigants in the case before them' or give 'opinion[s] advising what the law would be upon a hypothetical state of facts.'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Lewis,* 494 U.S. at 477).

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt,* 455 U.S. 478, 481 (1982)).

In other words, "a case is moot if 'developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief.'" *Hamilton*, 862 F.3d at 335 (quoting *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698–99 (3d Cir. 1996)).

Once a prisoner who is complaining about his conditions of confinement is transferred from the prison about which he is complaining, the court generally cannot grant him meaningful prospective relief because he would not benefit from that relief. Thus, with limited exceptions, his claims for declaratory[20] and injunctive relief are moot. *See Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2003) (stating that "[a]n inmate's transfer from the facility complained of generally moots the equitable and declaratory claims"); *Marshall v. Pa. Dep't of Corr.*, 499 F. App'x 131, 134 (3d Cir. 2012) (concluding that because Marshall "asked for an injunction that restrains SCI–Mahanoy officials from violating his civil rights, but

---

[20] "The purpose of a declaratory judgment is to 'declare the rights of litigants.'" *CMR D.N. Corp. v. City of Philadelphia*, 703 F.3d 612, 628 (3d Cir. 2013) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)). Although "[t]here is no question that a plaintiff can request declaratory relief to remedy alleged ongoing violations of her constitutional rights[,]" a "[d]eclaratory judgment is not meant to adjudicate alleged past unlawful activity." *Wenzig v. Serv. Emps. Int'l Union Loc. 668*, 426 F. Supp. 3d 88, 100 (M.D. Pa. 2019), *aff'd sub nom. Diamond v. Pennsylvania State Educ. Ass'n*, 972 F.3d 262, 265 (3d Cir. 2020). "The remedy is thus by definition prospective in nature." *CMR D.N. Corp.*, 703 F.3d at 628.

he has now been transferred out from under their control[,] . . . the District Court was unable to fashion any form of meaningful relief against these defendants, and thus the motion for injunctive relief was moot").

"Like most rules, mootness has exceptions and 'when a litigant is unable to meet the requirements of the general mootness inquiry, the litigant may invoke an exception to the mootness doctrine to gain judicial review.'" *Hamilton*, 862 F.3d at 335 (quoting *Chong v. Dist. Dir., INS*, 264 F.3d 378, 384 (3d Cir. 2001)). One exception to "the mootness doctrine [is] for a controversy that is 'capable of repetition, yet evading review.'" *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016) (quoting *Spencer v. Kemna,* 523 U.S. 1, 17). But "[t]hat exception is 'narrow' and 'applies only in exceptional situations[.]'" *County of Butler v. Governor of Pennsylvania*, 8 F.4th 226, 231 (3d Cir. 2021) (quoting *Hamilton*, 862 F.3d at 335). "A dispute qualifies for that exception only 'if (1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again.'" *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1540 (2018) (quoting *Turner v. Rogers,* 564 U.S. 431, 439–440 (2011)). "There must be more than a theoretical possibility of the action occurring against the complaining party again; it must be a reasonable expectation or a demonstrated probability." *County of Butler*, 8 F.4th 226 at 231.

31

And it is the plaintiff's "burden to show that the 'capable of repetition yet evading review' exception applies." *Id*.

Here, Rivera invokes the "capable of repetition yet evading review" exception to mootness; he asserts that he could be transferred back to SCI Benner Township. But Rivera has not met his burden of showing that the exception applies. Whether Rivera will ever again be incarcerated at SCI Benner Township is speculative. On top of that, even if he were returned to SCI Benner Township, it is speculative whether he would again be incarcerated in the RHU. Further, even if he were returned to the RHU at SCI Benner Township, it is speculative whether he would be in the open-air telephone cage at a time when OC spray is being used on another inmate across the block. Such speculation is not sufficient to show that there is a reasonable expectation that Rivera will again be faced with the same conditions about which he is complaining in this case. *See Hamilton*, 862 F.3d at 336 ("[M]ore than speculation is required to invoke the capable-of-repetition exception."); *Abdul-Akbar v. Watson*, 4 F.3d 195, 206–07 (3d Cir. 1993) (finding request for injunctive relief moot and rejecting speculation that the prisoner could again be incarcerated on the same prison unit about which he was complaining). Thus, Rivera has not met his burden under the "capable of repetition yet evading

review" exception.  Accordingly, his claims for declaratory and injunctive relief

are moot.[21]

## VI.  Conclusion.

For the foregoing reasons, we will grant the defendants' motion for

summary judgment.  An appropriate order follows.


*S/Susan E. Schwab*
Susan E. Schwab
United States Magistrate Judge

---

[21] In his brief, Rivera also suggests that these claims are not moot because he is challenging a policy and he is still subject to such policy.  But Rivera has not pleaded, nor presented, his claims as based on a policy.  And a passing suggestion in a brief cannot change the nature of a claim.  In any event, Rivera has not presented any evidence of a policy.